We're going to call the next case on the docket then if the Council wants to come up and get ready. It's 516-0345, People v. Michael Thompkins. Alright, when you're ready to proceed. May I have your name? Yes, your name. May it please the Court, Counsel, Assistant Appellate Defender Enzo Knob on behalf of Michael Thompkins. There are three arguments on appeal. The focus today will be on the first argument, and we will rely on the briefs for the remaining arguments. A jury found Mr. Thompkins guilty of first-degree murder, attempt first-degree murder, and home invasion. The issue before this Court involves whether defense counsel, by informing the jury during opening statements that it should find Mr. Thompkins not guilty of first-degree murder, but rather find him guilty of second-degree murder, amounted to ineffective assistance of counsel, where he ultimately was never able to give the jury or deliver on that promise of a second-degree murder verdict for him. To begin, there's no doubt that attorneys are often faced with challenging cases that, you know, allow or that require us to make, at times, good faith arguments to expand on the law. However, a challenging case doesn't alleviate our responsibilities of providing reasonably effective assistance of counsel. Accordingly, while an attorney doesn't have to fulfill every single promise that's made during opening statements, an attorney who does make and then break a promise to present a defense, as in this case, to present a second-degree murder option for the jury, has performed efficiently if, unless there's an unexpected event that comes up at trial, he fails to deliver. What other defenses were available to the defendant, in your opinion? Your Honor, the other defense would have been that he was innocent, that he didn't do this. But by limiting the jury to a second-degree murder or a first-degree murder option, there was no not-guilty option for the jury. In this case... Do you believe there was a valid defense for actual innocence? Your Honor, I think that's, as you said, it's a difficult case. The option here was that there was no type of defense that the counsel allowed for the jury to choose here. Regardless of what other defenses were available, ultimately, because of what counsel did, there ended up being no other defense. But to follow up with Justice Cates, defense trial counsel came up with the defense of not guilty after the ruling had been made on the second degree. So he knew he had to change courses, and he did it based upon the trial court's finding. So he did say, essentially, you can find him not guilty. So he did actually come up with a defense after the fact, correct? That's correct, Your Honor. But the problem here isn't that he made this good-faith argument. Of course, attorneys are allowed to do that. The problem here is procedurally how he did it. As I was about to say, the trial court told the jury from the beginning, this is a case that involves first-degree murder, attempt, home invasion. The trial court read to the jury the charging documents, which, again, said first-degree murder, attempt, and home invasion. What was improper about that? So I'm just laying out that, foundationally, this is what the jury heard, first-degree murder, attempt, and home invasion, repeatedly throughout the trial. Defense counsel was the only person that raised the second-degree murder option. And then, ultimately, he wasn't able to deliver. It's as if counsel said something about a self-defense theory or the defendant testifying. Here, it was only the defense counsel who gave this option and ultimately wasn't able to deliver. That implants that idea to the jury that defense counsel said that this was going to happen, but it ultimately didn't happen. And that's where the prejudice comes in. No one else talked about the second-degree murder option. It wasn't an option, actually, because Illinois courts have repeatedly avoided addressing this issue. And as the trial court, they needed to follow the appellate court and the Supreme Court. Excuse me. Wasn't there a motion in Lemonade where this issue popped up of sudden and intense passion? I think there was an auto protection that they wanted to get in, and the court said, no, I'm going to bar that unless the defendant brings up this issue of sudden and intense passion. So it would seem to me that the court had not ruled it out. In other words, any definite decision that this is not going to be definitely not entertained. So I don't know if this wouldn't have been a red light. I'm sorry, a green light for the defense to continue with this particular line of thinking. So if we go to the opening brief on page eight, on April 6th is when the trial court addressed this. But actually, it was the state that brought this up. It was the defense counsel trying to ask the court pre-trial, which is what we're complaining about here, is if counsel did this pre-trial and got some sort of ruling that, hey, defense counsel, if you can establish A, B, and C, we'll give this verdict for them. Or, hey, defense counsel, I agree that Illinois law doesn't allow this at this point, but I'm going to expand it for you. If the trial court gave them any type of green light or any type of even yellow light to go forward, then this wouldn't have been a problem, except here defense counsel gave that initial notice to the state, saying we're going to allege serious provocation as a defense. It didn't specify, defense didn't specify exactly what category. And in Illinois, as you know, there's four categories. So the state tried to limit the defense on what category it would be asserting, and it's the state's attorney that brought up the issue of, you know, Ms. Horn and Mr. Tompkins were never married. Ms. Horn and Ms. Tompkins had a dating relationship, but it had terminated. The problem that we're asserting now in appeal is that counsel never got that yellow light. It never asked the trial court, hey, judge, what do I have to establish to get this jury instruction? And then without any type of yes or no, counsel told the jury during opening statements, where it's the first time the defense gets a chance to say their defense, that you'll get the option. Don't find them guilty at first, find them guilty of second-degree murder. And the baseline here, the starting point with that argument or that opening statement is that a murder occurred. And then once there's no second-degree murder verdict for them, the only option is first-degree murder. Defense counsel himself stated that this was a murder. So that's the problem here. If there was no defense, defense counsel could have poked holes, asked different questions on cross-examination. But you have to show that there was a certain amount of prejudice. Yes, Your Honor. Where is the prejudice here factually? Your Honor, if there's no not guilty option, that's the prejudice. Well, there is a not guilty verdict for them. Well, not according to defense counsel, and that's what we're alleging is ineffective assistance. So ineffective assistance is by telling the jury that, hey, jurors, you have two options, murder or murder. It's just first-degree or second-degree. No, wait a minute. I don't mean to stop you, but you cannot be arguing to us that as part of the jury instruction there was not included, we the jury find the defendant either guilty or not guilty, and they would mark each one. I mean, there had to be an instruction given where they had the ability to find him not guilty. That's correct, Your Honor. Do you think the jury was confused in this case? Well, there was some confusion that we did address for the attempt of first-degree murder, but the jury did have questions about what that instruction entailed. So I know it's not the first-degree murder issue that we're just addressing right now, but arguments two and three address the attempt, and the jury did ask two questions, two very specific questions as to the intent that was necessary for the attempt case. So here, I think the jury actually didn't have questions about the first-degree murder because defense counsel gave that up, saying it's murder or murder. I know, Your Honor, there was that, obviously, the not guilty verdict form. That goes out for every case. If it wasn't that, that would be a problem. But the issue is... You'd be surprised. I haven't seen it yet. But our argument is that counsel failed. He acted unreasonably by limiting the jury. With the verdict form, of course, the jury could have decided differently, except for the fact that counsel already implanted in their minds from the beginning that this was a murder. And, as Your Honors know, in Illinois, to establish second-degree murder, all of the first-degree murder... So the only thing that he was asking for is that the spousal adultery... Thank you. The spousal adultery defense was available. And he didn't ask for it pre-trial, and that's the problem here. Pre-trial or outside the presence of the jury, he could have done as much of that as he wanted. The problem is that he did it to the jury. You're going to have a few minutes to respond. Yes, Your Honor. The state's argument. Mr. Miller? May it please the Court, counsel, my name is Max Miller, and I represent the people of the state of Illinois. Your Honor, with regards to the ineffective assistance of counsel issue, with the court's permission, the state would rather first address the sufficiency of the evidence issue because it believes that the weight of the evidence has a direct bearing on both the ineffective assistance of counsel and the alleged improper jury instruction to the extent that, for Strickland, the defendant had to show that the conduct of the attorney was objectively unreasonable and that the defendant suffered prejudice, which therefore denied him a fair trial. But the state's position is that the weight of the evidence was such that defense counsel here had no alternative option. There was nothing to do except for to argue a quite creative solution to the problem, that, you know, there is this fact that Illinois law does not preclude nonmarital relationships. It's just the case that in Illinois jurisprudence they have only recognized marital relationships. But what could the prejudice be in the sense that if he did not offer that argument, there is no other defense to this crime, and why is that the case? Getting to the second issue, the state did provide sufficient evidence of an intent to kill Jessica Horne when this defendant struck her in the head, and we have this interesting circumstance where the testimonial evidence, the forensic evidence, the defendant, and the victim all say the exact same thing and tell the exact same story. The testimony, Deputy Penrod testified that when he responded to Horne's apartment that the outer glass door was shattered, the main glass door was shattered. There's a metal sign with a pole in the kitchen on the floor. The kitchen's disheveled. He goes. There is a light on in the bathroom. The door's kind of closed. He goes in there. The bathroom floor is covered in blood. We have Blake, who has leaned over the tub. He's dying. And we have Horne, who is sitting there kind of in a state of shock, covered in blood with multiple wounds. Sergeant Cody Brown substantiates this. He walked in. He saw the exact same thing. The addition to his testimony was he noticed a bloody footwear impression. Beth Harrell of the ambulance service, she noted the wounds on Horne, and she saw a barbecue fork on the floor by her. Jessica Horne, the victim, testified herself, and she identifies the defendant. She says that as her and Blake began to have sex, there's a crashing sound on the door. The defendant is running in. He's trying to get into the apartment. Worth noting, she called in the phone records to the police department earlier saying that she was concerned that the defendant might try something. And as this was going on, she was actually on the phone with 911, and she retreated to the bathroom and was in the bathroom. Her and Blake went in there because it was the only room in the home that had a lock besides the outside. So once he was in, they barricaded themselves in there. As they do that, the defendant begins smashing through the door with what she says is a crowbar-like object. We now know it was a piece of a street sign. And he hits her and strikes her on the head. That's what defendant's main disagreement is here is did he have the intent to kill Jessica Horne when she was struck in the head. And the state maintains that he had the intent to kill Jessica Horne and Sean Blake the minute he crashed into that apartment. Well, one of the issues seems to be the charging instrument said that he, at least the attempt, he knowingly struck Horne in the head with an object intending to cause the death of Horne. But there was additional evidence that he stabbed her in the shoulders and the hands. Do you believe the state was limited to the charging agreement? What about the additional evidence that came in? No, Your Honor, I think that all the state was doing was, this was the first contact that the victim had with the defendant, at least in the sense that he was physically hitting her. But as to why he ultimately was stabbing her as opposed to using the sign, we see a broken street sign later and we see he killed Blake with a knife. But the handle was broken off the knife. And the state's contention here is that the defendant was literally using any means at his disposal to kill these two. And as one failed, he adapted and tried to use another. And how do we know this? Because they – so he breaks into the apartment, but they're locked in the bathroom. He has every chance to withdraw if that's what he was going to do. He smashes through with the sign, presumably breaking the sign. She testifies that she hears him running around the kitchen. He comes back with a knife and a barbecue fork. How do we know he broke the knife? Because Jessica Horne, when he is coming to stab her with the fork, reaches for the knife to pick it up. She can't pick it up because the handle is broken off. I'm sorry. On the issue of intent to kill, the fact that he wrote a letter indicating that he was, in fact, going to kill her. Absolutely, Your Honor. The letters, we think, are starkly revealing because although they were written, admittedly, about six months after the fact, only six months after he murdered someone, he describes his mental state from the beginning of the night to the end in a totally consistent way with the evidence and with Horne's testimony in such a way that he actually makes it clearer what happened that evening, that he was waiting at her house, that he wanted to see if she still lived there. He sees her come up with some guy and he thinks, well, no, I'm not going to leave. I'm going to wait and see what's going on. We have a footwear impression that means he was looking into the window. He sees them begin to have sex, and as he describes it himself, he loses himself. He absolutely says he's never felt like that in his life before. He felt like a totally different person. And what does the defendant himself say? He didn't come back from that person until she is pleading for her life, holding the barbecue fork that he's attempting to kill her with, and he says, I grabbed the fork to kill her.  He says in the letter that the victim said, just think about it. Just shut up. And then he kind of transforms. Absolutely. What about the, maybe I shouldn't bring this up, but what about, was he examined for mental competency? I'm not familiar with that. I didn't review his names and I don't believe he came up in the investigation. That's why I said I should not promise to ask the question. I apologize. Anyway, yes, go ahead. I interrupted you about the letter. It was quite appropriate, I think. That it was surprisingly descriptive, and it shows that the intent to kill overcame, or that was at least present with the defendant, regarding both Blake and Horn before he even entered the house. Because he says, the moment I saw them having sex, I went to this other person, and he says, I didn't come back until I'm holding this barbecue fork ready to kill her. And she says, think of the show. And then he says, I did come back. And he drops the fork, and he walks out. That's exactly what he says is what Horn says. And the defendant argues, well, he wasn't concerned about her calling the police, therefore, he didn't have faith he was never going to kill her in the first place. And that just does not seem to be what the evidence says. And the state believes this not only was proven beyond a reasonable doubt, but certainly that any rational prior effect under that standard on appeal, that certainly someone could infer an intent to kill. And therefore, because of the comprehensiveness of that evidence and the admission by the defendant of what happened, it doesn't seem that defense counsel was really left with many viable routes for comprehensive theory of defense. And so what he did was he looked at the only other laws it was, and he found a novel way to do it, and he proceeded accordingly. And although it was ultimately unsuccessful, it was certainly a valid attempt. Well, that goes back to it was probably a valiant attempt. But what counsel brought up is he should have done it before the trial even started. So he doesn't even have the ability to make that argument to the jury in the first place. So what's your stance on that? Your Honor, in reviewing the briefs, I wasn't aware of any case law that was cited that precluded him pursuing it, despite the fact that they had had a hearing on it before him because the state's view of the hearing was that the hearing was not really spotted. He submitted the same argument that we have on appeal, which is we're using the exact same cases. The cases don't preclude it, but it's never been done before. But if we're under ineffective assistance, that is a question, if I'm trying the case and I'm trying to put a defense out for this defendant, I want to know before I even set foot in that courtroom, what am I allowed to argue or what am I allowed to say in my opening statements? And the trial court didn't give him that ability. He had to, not to be colloquial, wing it in his opening statements when it would have been very beneficial to have that ruling made prior to the trial and it just didn't get done. Sure, but, Your Honor, I would say that until the jury instructions were issued, that he still had every ability to argue for a second-degree murder instruction in the hopes of convincing the trial court, who had not said that it was precluded, as much as convincing the jury. And then when the trial court did not offer the instruction, I would say that defense counsel said, we ask you to return a verdict of not guilty. And in that way, he was able to kind of salvage the not guilty alternative from a situation where he had no defense or no way of saying, well, the defendant wasn't there that night, a murder weapon, you can't prove that he used it, et cetera. And are there no further questions? I have one question. And this is perhaps an unfair question because I'm going to ask you to put yourself in the position of trial judge. Now, obviously, the trial jurors have not given a definitive ruling on this issue of sudden and intense passion involving something other than a murder of a partner, but the trial jurors did hear and observe defense counsel going down his rope. Now, if it was so certain in the trial judge's mind that this was not going to be allowed, don't you think that the trial judge would have said, let's have a little sidebar here and tell him you've walked up the wrong tree, rather than wait all the way into the instruction conference and then say, I'm not going to allow this? Certainly, Your Honor, that seems the most reasonable approach. Thank you. Thank you very much. Ms. Long? Yes, Your Honor. Just a few points. He did have a mental health or mental fitness evaluation done. He was found fit, so there wasn't much of that. I do want to focus and end with prejudice, so I think that's the biggest issue before this Court. We're not saying that he didn't present any type of defense because there were the cases of attempt to first-degree murder and home invasion that he still had to address. The problem is with first-degree murder, he just didn't give that option, and if you look at his cross-examination questions, and that's why we argue that he should have done this pretrial. His cross-examination questions were tailored to establish second-degree murder, and we're not saying that he didn't try to establish it. We're saying that he did it incorrectly procedurally. He tried to elicit testimony about it. If you look at what Justice Wharton just asked about, if you were in the shoes of the circuit court, put yourself in the shoes of a lawyer, a defense lawyer. With these letters, he really didn't have an actual innocence claim, right? I mean, how do you get to actual innocence with the letters that he wrote? Not to mention all the other evidence. But the best level of intent is the defendant's own mouth, which these letters speak for him. Yes, Your Honor, so we don't exactly know what happened, but if that was the case and defense counsel knew that the only option was the second-degree murder option, he should have done this pretrial. If this wasn't an option, then he should have advised Mr. Tompkins, hey, there is no option, but still acted reasonably. So reasonable counsel would have done this pretrial because by doing it, we know from lots of cases that by telling the jury during opening statements, certain types of evidence will come out, certain types of defenses will be elicited. If you tell that during opening statements, I think there's a case cited in our brief that says it implants this idea in the jury, and they're expecting to see this throughout trial. And ultimately when it doesn't appear, they don't have an option. And as I was saying, counsel elicited this information about whether Mr. Blake and Ms. Horn's pants were off, if there were blinds or curtains on the windows to elicit that second-degree murder evidence to produce that instruction. But the problem is he didn't have any type of reason to pursue this when in Illinois, this wasn't a foreshore-gone-conclusion that you can get a second-degree murder instruction if they're in a dating relationship, if they have a child. All the cases avoided addressing this specific issue. That should have been a flag for counsel to request this pretrial in a motion to eliminate, especially when the state brought it up. So counsel knew from the get-go that this wasn't an expected or 100% guaranteed option for him or option for Mr. Tompkins by just establishing that they had a dating relationship, that they had a child, that it would automatically trigger a second-degree murder verdict for him. And obviously very little is needed for that verdict for him, except when Illinois never recognized this. That's the problem. If Illinois never recognized this, this should have been a pretrial or outside-the-jury-type discussion. And as I stated before, counsel had numerous opportunities. The state brought it up, and at that point, he could have asked the trial court. And as your Honor, as the state, as the trial court, if I'm not asked to make a certain decision or make a certain ruling, I don't think the trial court can just kind of give that ruling up without being asked to do so. And that's why there's motions to eliminate and pretrial hearings to address this. But in the end, counsel never asked the court, and I think that that is the main issue here. So unless there's any other questions, we ask that this court reverse the remand, that first-degree murder conviction, so that he can get a new trial. Okay. Thank you very much. No problem.